1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ISRAEL ORTIZ, | ) | 1:04-cv-05287-TAG HC |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS (Doc. 1) |
| v. | ) | |
| | ) | ORDER DIRECTING CLERK OF COURT TO |
| ANTHONY LAMARQUE, Warden, | ) | ENTER JUDGMENT FOR RESPONDENT |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving a sentence of 25-years-to- life with the possibility of parole pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury of conspiracy to commit murder, a violation of California Penal Code § 182.  (CT 211; Doc. 6, Exh. 1).

Petitioner appealed his conviction to the California Court of Appeal for the Fifth Appellate District ("5th DCA"), case number F036546, claiming, inter alia, that the trial court erred in concluding that Petitioner's confession was voluntary and in permitting said confession to be admitted into evidence.  (Doc. 6, Exh. 2).  On August 12, 2002, the 5th DCA issued an unpublished decision affirming Petitioner's conviction.  (Doc. 6, Exh. 3).  On September 16, 2002, Petitioner filed a petition for review in the California Supreme Court, which was denied on October 23, 2002. (Doc. 6, Exh. 4).

1    On February 13, 2004, Petitioner filed the instant habeas corpus petition, alleging that the

2 trial court violated Petitioner's federal right of due process by allowing the purportedly coerced

3 confession to be admitted into evidence at trial. (Doc. 1, p. 6).  On June 22, 2004, Respondent filed

4 an answer to the petition. (Doc. 6).  Although Petitioner was granted additional time within which to

5 file a traverse, no traverse has been filed to date.

6    Respondent concedes that Petitioner has exhausted his claims.  (Doc. 6, p. 2).

7                                    **FACTUAL BACKGROUND**

8    The Court hereby adopts the limited statement of facts summarized by the 5th DCA in its

9 unpublished opinion:

10   At approximately 6:00 a.m. on September 7, 1999, 15-year-old Keagan A. woke up to
     go to school.  Keagan lived in a trailer house with his mother, Deborah A., his younger
11   sister, 14-year-old Kori A. and George, a friend of the family.  Keagan shared one of
     the two bedrooms with Kori A.  George slept in the other bedroom, while Keagan and
12   Kori's mother slept on the couch in the living room.  After he woke up, Keagan went
     into the living room and tried to wake his mother who was asleep on the couch.
13   Keagan called out to his mother.  Receiving no response, Keagan went over to the
     couch and shook his mother.  Deborah A. moved a little bit, but did not wake up.
14   Keagan turned on the light and noticed Deborah A. had vomited on herself.  Keagan
     again shook his mother and Deborah's eyes opened a little bit, her hand moved and
15   then she went back to sleep.  Keagan noticed blood on Deborah's head.  Keagan called
     911.
16
     Kori A. was not in the trailer that morning, although she had been in the bedroom with
17   her brother around 10:00 p.m. the previous night.  Before falling asleep the night
     before, Keagan heard Kori going through her dresser drawers, which Keagan thought
18   unusual.  Keagan asked Kori to close their bedroom window, but Kori would not do
     that.
19
     In response to Keagan's 911 call, an ambulance and a deputy sheriff were dispatched
20   to the trailer house.  Deputy Galvez entered the trailer to ensure the safety of the
     paramedics, before he allowed them inside the trailer.  Deputy Galvez found Deborah
21   A. lying on the couch and noted she had a wound to her head.  Deborah A. "was awake
     and she was moving slightly and her eyes were blinking."  After checking the trailer,
22   and finding only Keagan and George inside, Deputy Galvez allowed the paramedics
     to enter.  While securing the scene for the detectives, Deputy Galvez noted a shell
23   casing on the floor.  Realizing the significance of this find, the paramedics quickly
     transported Deborah A. to Kaweah Delta District Hospital.
24
     Neurosurgeon Sana Ola Bhatti, M.D., treated Deborah A. upon her arrival.  A CAT
25   scan and examination showed a bullet wound just above Deborah A.'s right eyebrow.
     When Dr. Bhatti first saw Ms. A. she was purposefully moving the left side of her
26

27

28

1
2
3
4

body.  Because Ms. A. was not comatose,[1] Dr. Bhatti elected to do a craniotomy to remove bone fragments from her brain and to insert a tube to drain water from her brain.  The CAT scan showed the bullet traveled from the right side of her brain to the left side of her brain, coming to rest about the level of her left ear.  Because of the gunshot wound, Deborah A. sustained a severe brain injury, leaving her permanently disabled.

5
6
7
8
9

At approximately 9:00 a.m. on September 7, 1999, appellant and Kori A. were arrested at appellant's home in Woodville, California, on suspicion of attempted murder.  They were both transported to Visalia where they were questioned concerning the shooting of Kori's mother.  After being advised of, and then waiving his Miranda rights, appellant (age 18) initially denied any involvement with the shooting.  Later appellant admitted he and Kori had planned to kill her mother so that he and Kori could be together.  Appellant admitted he had shot Deborah A. around 11:00 p.m. on September 6, 1999, as she lay asleep on the couch.  He demonstrated for the detectives how he used Kori's pillow, which she provided, to muffle the gunshot from the .25-caliber automatic pistol he used.[2]

10

(Doc. 6, Exh. 3, pp. 3-5).

11

**DISCUSSION**

12

**I.  Jurisdiction**

13

    Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

14

to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of

15

the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

16

375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the

17

United States Constitution.  The challenged conviction arises out of the Tulare County Superior

18

Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.

19

§ 2241(d).  Accordingly, the Court has jurisdiction over this action.

20

    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

21

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

22

Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997);  Jeffries v. Wood, 114

23

F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by

24

25
26

    [1]Dr. Bhatti testified that patients with similar injuries, who arrive comatose at the hospital "all uniformly" die.  Because Deborah A. was showing purposeful movement Dr. Bhatti elected to do surgery.

27
28

    [2]Police recovered the pistol, after appellant agreed to show them where he had hidden it.  The pistol was recovered in Woodville from inside of an old dishwasher that was inside of a shed located in the backyard of one of appellant's neighbors.

1  Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA applicable only to cases filed after statute's

2  enactment).  The instant petition was filed on February 13, 2004, after the enactment of the AEDPA,

3  and thus it is governed by the AEDPA.

4  **II.  Legal Standard of Review**

5  A petition for writ of habeas corpus under 28 U.S.C. 2254(d) will not be granted unless the

6  adjudication of a prisoner's claim (1) "resulted in a decision that was contrary to, or involved an

7  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

8  the United States" or (2) resulted in a decision that "was based on an unreasonable determination of

9  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

10  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

11  The first prong of Federal habeas review involves the "contrary to" and "unreasonable

12  application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed

13  questions of law and fact.  Williams v. Taylor, 529 U.S. at 407- 410;  Davis v. Woodford, 384 F.3d

14  628, 637 (9th Cir. 2004).  A State court decision is "contrary to" clearly established Federal law

15  "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases,

16  or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision

17  but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v.

18  Taylor, 529 U.S. at 405.  A State court decision involves an "unreasonable application" of clearly

19  established Federal law "if the state court applies [the Supreme Court's] precedents to the facts in an

20  objectively unreasonable manner."  Brown v. Payton, 544 U.S. at 141.  Consequently, a Federal court

21  may not grant habeas relief simply because the State court's decision is incorrect or erroneous; the

22  State court's decision must also be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 511

23  (2003),  citing Williams v. Taylor, 529 U.S. at 409.  Section 2254(d)(1)'s reference to "clearly

24  established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

25  decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. at 412;

26  Lockyer v. Andrade, 538 U.S. at 412; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

27  ///

28  ///

1   The second prong of Federal habeas review involves the "unreasonable determination" clause
2   of 28 U.S.C. § 2254(d)(2).  This prong pertains to State court decisions based on factual findings.
3   Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under
4   § 2254(d)(2), a Federal court may grant habeas relief if a State court's adjudication of the petitioner's
5   claims "resulted in a decision that was based on an unreasonable determination of the facts in light of
6   the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v.
7   Wood, 114 F.3d at 1500 (when reviewing a State court's factual determinations, a "responsible,
8   thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").
9   A State court's factual finding is unreasonable when it is "so clearly incorrect that it would not be
10   debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.
11   2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).  The AEDPA also requires that
12   considerable deference be given to a State court's factual findings. A State court's factual findings
13   are  presumed to be correct, and such presumption of correctness may be rebutted only by clear and
14   convincing evidence.  28 U.S.C. § 2254(e)(1).

15   To determine whether habeas relief is available under § 2254(d),  the Federal court looks to
16   the last reasoned State court decision as the basis of the State court's decision.  Robinson v. Ignacio,
17   360 F.3d 1044, 1055 (9th Cir. 2004).  Where the State court decided the petitioner's claims on the
18   merits but provided no reasoning for its decision, the Federal habeas court must independently
19   review the record to determine whether habeas corpus relief is available under § 2254(d).  Himes v.
20   Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 981-982 (9th Cir.
21   2002).  Where the State court denied the petitioner's claims on procedural grounds or did not decide
22   the claims on the merits, the deferential standard of the AEDPA do not apply and the Federal court
23   must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.
24   2002).

25   **III.  Review of Petitioner's Claim**

26   The instant petition alleges the following ground for relief:

27   Ground 1.      The trial court erroneously admitted Petitioner's coerced pretrial statement in
                     violation of Petitioner's right to due process under both the California and
28                   U.S. Constitutions.

1

2

**Ground One:**      **The trial court erroneously admitted Petitioner's coerced pretrial statement in violation of Petitioner's right to due process under both the California and U.S. Constitutions.**

3

4

Petitioner contends that the State court erred in upholding the trial court's determination that

his confession was voluntary. (Doc. 1, pp. 6-7). Specifically, Petitioner contends that his confession

5

was involuntary because police interrogators made significant misrepresentations to him during the

6

interrogation as well as promises of better treatment should he confess. As explained below,

7

however, the Court concludes that Petitioner has failed to establish that the State court's adjudication

8

of this issue was contrary to or an unreasonable application of clearly established Federal law.

9

Therefore, his habeas petition must be denied.

10

     1.  The Proceedings In State Court.

11

         A.  The Voluntariness Hearing.

12

Prior to trial, the State court conducted a hearing to determine the voluntariness of

13

Petitioner's confession and whether he had properly been advised of his Miranda rights. (Lodged

14

Document ("LD") 3, pp. 1-43). Mario Martin, a detective with the Tulare County Sheriff's

15

Department, testified that, after Petitioner's arrest in Woodville, he was transported to the Violent

16

Crimes Office and placed in an interview room. (LD 3, p. 17). The room is approximately six feet

17

by ten feet in area, and contained a table, and three or four chairs. (Id.). The interview began with

18

only Petitioner and Martin present, but at some point Sergeant Logue joined the other two men.

19

(Id.).

20

Petitioner was seated at the table, farthest from the door, while Martin stood near the door.

21

(Id. at 18). Martin testified that Petitioner was a suspect but that at no time did the officers draw

22

their weapons or threaten Petitioner. (Id. at 19). Prior to interrogating Petitioner, Martin advised

23

him of his Miranda rights. (Id. at 19-20). After acknowledging that he understood his rights,

24

Petitioner agreed to talk with Martin. (Id. at 20-21).

25

Martin testified that in order to get Petitioner to talk, he told him that Kori was taking all of

26

the blame; however, that was not true at the time he said that to Petitioner because Kori had not said

27

anything yet. (Id. at 25). Martin also conceded that either he or Logue asked Petitioner how he

28

would feel it if had been his mother who had been shot. (Id.). Martin also told Petitioner that police

had gunshot residue test results that implicated Petitioner, but, again, that was not true. (Id.).  Later, Martin testified that Logue told Petitioner that "I guarantee you, you'll be looked at in a better light," if Petitioner told the truth. (Id. at 26).  Martin indicated that all of these were "methods of asking him questions to get the truth out of him." (Id. at 25-26).

Petitioner testified that he initially asked to make a phone call but was told he must wait. (Id. at 29).  Petitioner never asked to have his mother present during the interrogation. (Id. at 29-30). When Petitioner asked to go to the bathroom, an officer took him to the bathroom. (Id. at 30). During the interview, Martin was alternately sitting and standing; he has his weapon in a holster on his right side. (Id.. at 31-32).  Petitioner testified that the officers never promised him anything if he would talk. (Id. at 32).

After finding that Petitioner had properly been advised of his Miranda rights, the trial court then concluded that the confession was not coerced:

> "I don't see any problem here at all.  I think there's no indication that anybody was coercing anybody.  They maybe tried a few trick tactics which are normal course of events once we get into the interview, but I see no problems with any Miranda rights or with any voluntary portions of these—or, rather, the defendant being coerced into making these statements in an involuntary fashion.  I just don't see any problem with any of it and it can all come into evidence pending the—or subject to those rulings that we made earlier in where we're going to delete some of the references to that." [3]

(Id. at 35-36).

### B.  The Transcript Of The Interrogation.

In the relevant quoted portion of the transcript of the interrogation, which the trial court had read and considered before making the above ruling, the following discussion took place after Sergeant Logue entered the interview room:

Martin: So you don't know what happened?  See this tape he's holding right here.

Petitioner: What about it?

Martin: It's exactly what happened.

Logue: Let me put it to you this way Israel.  You can continue your little mascarade, your charade, do whatever you want.  But let me tell you how the process works. There's something called physical evidence which your body contains, that will lead

---

[3]The trial court admitted the transcript of the interrogation after working with counsel to identify problematic passages in the transcript that should be deleted. (LD 3, pp. 33-38). Subsequently, the tape was played for the jury during the trial. (LD 4, p. 105).

us directly to the crime.  There's also something called witness statements, that will lead us to who did the crime.  Okay, now look, when it comes time to court, go to court, we got these twelve people there, they're your peers, they're gonna judge you. ...

Logue (continuing): Well think about what they're gonna think if your story versus what Kori's already told us how it happened.  And think about this, when...when it comes time for you to be judged, when it comes time for you to be judged by the judge, when it comes time for sentencing do you think he's gonna be more lenient with a guy that tells the truth...

Petitioner: Than with a girl?

Logue: ...no, boy/girl has nothing to do with it.  A guy that tells the truth versus a guy that doesn't tell the truth, because physical evidence tells us one thing and he tells us that the physical evidence is not true, now look.  We know what happened, we know exactly and how it happened and we know why it happened.  Now I know it was a mistake and I know you wish it never did happen and I'm sure of that.  I know your[sic] probably not the type of guy to get involved in this type of thing. You don't look to me to be that type of guy Noe[4], you just don't.  But the one thing that is really bothering me about you is why your not being truthful.  What is causing this heart to override the brain.  Cause I know inside you want to tell me what happened and that's your only saving grace right now is to be truthful.  You can't continue this charade Noe, it's not gonna work.  You know we do this every day...

...

Logue (continuing): ...everyday we do this Noe.

Petitioner: Okay.

Logue: Everyday we interview people, everyday we find out the truth.

Petitioner: Tell me this, do you have a wife, don't you? Or you got a wife.

Logue: Sure.

Petitioner: I consider Kori as my wife cause I care about her as much to do anything for her.  Even lie, or even take my own life like I told you, if I go like I told, you know what if one day you just tell me that you don't want to be with me all you have to do is just tell me and I'll get out of the way.  Anything that makes you happy makes me happy.  I just don't want nobody to get busted, no one to get in trouble cause I know, I don't know what she told you alright.  I don't know what she told you.

Logue: Fine.

Petitioner: She probably told you the truth or she probably told you a lie, I don't know.

Logue: She probably told us the truth and a lie?

_____

[4]"Noe" was Petitioner's nickname.  (LD 4, p. 39).

...

Logue (continuing): At first you tried to tell us a mascarade or charade just like you're doing.  At first she did, but then she thought better of her actions and her heart overrode her brain.  Her heart told her the real path and that's the path she chose and she told us what happened.  Now she regrets it, and she's gonna regret it for years to come, but we can't take back what has happened but all we can do is make amends for what has happened.  That's all we can do, now you don't want to go through this whole process, this whole time for the rest of this, for how many ever years it takes putting on this, big...big lie.  I know you don't, your not that type of person Noe, what you want to do is you want to tell the truth, you want to take responsibility for your actions and it's right on the tip of your tongue right now, I can tell by looking at you.  It's right on the tip of your tongue and I don't know what is stopping it from coming out.  And you're a man, be a man.

Martin: You probably have told me you've been raised, your mom has told you, you know tell the truth, don't lie.

Petitioner: (Unintelligible) been raised with my mother.  I can't be far away from my mother, six days I was away from my mother I got so sick.

Martin: That's what we're saying, you know.  We know that you've been raised up alright.

Logue: Now think of it this way Noe.  Think of it this way, if this was your mother, say it was your mother that was shot last night or this morning, would you want the person to tell the truth?  Put yourself in shoes, uh or Chris' shoes and Keagan's shoes and Kori's shoes and ask yourself it you'd want to tell the truth.  Ask yourself, I know you would.  Your not the type of person that would...

Petitioner: I would...

Logue: What's holding you back?  Now we know you were there last night.  We know what exactly you did.  We know that she let you in the door, we know everything and we know why you did it and you got, you guys talked about it for a while.  We know exactly how you did it.  We know about the whole nine yards.  We know about how you concealed the noise, we know about everything.

Petitioner: How?

Logue: You tell me your side of the story and then I'll tell you if your telling the truth.  Now I'm not gonna lay all my cards out on the table for you.

Petitioner: You want me to lay my cards and you just take them right away huh?

Logue: No, I want you to tell me the truth as you know it.  Not this bull story, that you've been trying to give us for an hour now.  Now tell us the truth, tell us exactly what happened, how you guys discussed it, why you discussed it, where did you get the gun.  What did you do with the gun?  We know exactly what happened Noe, there's no need for this to continue.  Think about this, this is probably gonna be the biggest decision of your life.  You made actually the biggest decision of your life yesterday, last night and unfortunately it was the wrong decision, but just because you made the wrong decision now doesn't mean you can't make the right decision next.  It's the most vital thing for the rest of your life, right now, right here, this moment to tell us what happened.  And if you chose not to we cannot help you, you're gonna go down that road by yourself.  Now when it comes time for Det.

Martin to get up on the stand, raise his hand, and tell your side of the story as your [sic] said it versus the truth he will.  If you get up on the stand, or if you tell us the truth when he gets up on the stand he'll tell that and I guarantee you everybody will look at you in a better light.

Petitioner: Better light but still, but still I'll still be screwed all the way.

Logue: Look, evidence is already gonna tell us one thing that you're responsible.

Petitioner: Then why you asking me for?

Logue: Cause I want your side of the story.  Maybe it's a little different than Kori's, maybe it is.  But right now Kori is gonna get up on the stand and tell us one thing and that's her side of the story and we don't have the opportunity to have yours, except all this bull you've been trying to feed us for an your [sic].  It ain't gonna fly.  I'll guarantee you it ain't gonna fly.

Martin: You've already alluded to some reasons why this happened okay, give us a reason.

Petitioner: Why cause Kori was scared that her mother was gonna take us away.  Her mother wanted to send her away.

Logue: Where did she want to send her to?

Petitioner: To her father.

Logue: To her father, and that would separate you?

Petitioner: That would separate me from her cause her father lives like all the way to the border.

Logue: So is that why this happened?

Petitioner: She asked me and asked me and I go like, I was pressured and pressured and pressured and she goes well it's either that or it's goodbye forever.

Logue: So you decided to do what you guys did.  That's a reasonable answer, is that what happened?

Petitioner: I guess so.

Logue: I need a yes or a no from you?

Petitioner: Yeah.

(LD 2, pp. 49-54; Doc. 6, Exh. 3, pp. 14-18).

Following this exchange, Petitioner recounted the events leading up to and including the

assault on the victim, as well as the subsequent actions by Kori and Petitioner to flee to Woodville.

(LD 2, pp. 54-85).  At that point, the officers offered Petitioner something to eat. LD 2, p. 85).  The

///

interview commenced at approximately 11:50 a.m. and concluded at 1:30 p.m. (LD 2, pp. 2-3; p.

85).

                C. The 5th DCA's Opinion.

The 5th DCA's analysis of the voluntariness issue held as follows:

> "We find nothing coercive about the location where the interview was conducted, appellant was allowed to sit down during the interview, Detective Martin alternately stood or sat down while conducting the interview. Sergeant Logue sat while he was assisting in the interview of appellant. Appellant had been arrested at approximately 9:00 a.m. and was transported to the sheriff's department, where the interview was conducted. The interview began just before noon and was over shortly after 1:30 p.m. that afternoon. We find neither the length of appellant's detention, ro the duration of the questioning, as contributing to a coercive environment."

(Doc. 6, Exh. 3, pp. 12-13).

The 5th DCA then went on to consider the misrepresentations of Martin and Logue, as well

as their implied promises of leniency, concluding that Petitioner's own pre-trial testimony rebutted

any contention that the officers' misrepresentations and promises were the motivating factor leading

to Petitioner's confession. (Id. at 21).[5] Therefore, the 5th DCA concluded that the trial court did not

err in admitting Petitioner's confession into evidence. (Id. at 22).

For the reasons expressed below, the Court concludes that the State court's adjudication in

this regard was neither contrary to nor an unreasonable application of clearly established Federal law.

            2. General Principles On Voluntariness of Confessions.

As previously discussed, a Federal court may only grant a petition for writ of habeas corpus

on a claim that the State court has heard on the merits if the state court's decision (1) "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal

---

[5]Although, at first reading, the 5th DCA's analysis seems to apply a State standard providing that, in order to find involuntariness, the improper promises must be the "motivating factor" leading to the confession (Doc. 6, Exh. 3, p. 21), the 5th DCA began its discussion by noting that the adoption of Proposition 8 in 1982 required California courts to apply *Federal law* in assessing claims such as involuntariness. (Id. at p. 7). The 5th DCA then properly characterized the federal test as involving the totality of the circumstances and cited as support Schneckloth v. Bustamonte, 412 U.S. 218 (1973) and Jackson v. Denno, 378 U.S. 368 (1964), both of which are seminal United States Supreme Court cases on involuntary confessions. (Id. at pp. 7-8). Since the 5th DCA also considered the physical environment of the interview room and the physical conduct of Martin and Logue, as well as the officers' interrogation tactics, their misrepresentations, and their promises, the Court concludes that, viewed in its broader context, the 5th DCA's opinion applied the correct Federal test in the correct way. The only issue thus before this Court is whether the 5th DCA's adjudication of this issue was contrary to or an unreasonable application of clearly established Federal law.

1  law . . . or (2) resulted in a decision that was based on an unreasonable determination of the facts in

2  light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). The Supreme

3  Court has interpreted section 2254(d)(1) as follows:

4      Under the "contrary to" clause, a federal habeas court may grant the writ if the state
       court arrives at a conclusion opposite to that reached by this Court on a question of
5      law or if the state court decides a case differently than this Court has on a set of
       materially indistinguishable facts. Under the "unreasonable application" clause, a
6      federal habeas court may grant the writ if the state court identifies the correct
       governing legal principle from this Court's decisions but unreasonably applies that
7      principle to the facts of the prisoner's case.

8  Williams v. Taylor, 529 U.S. at 412-413. Section " 2254(d)(1) restricts the source of clearly

9  established law" to that of the United States Supreme Court. Id. at 412.

10         Based on § 2254(d)(1), the question before the Court is not whether the trial court erred in

11 concluding that the confession was voluntary, but whether the State court's determination that the

12 trial court did not err in ruling the confession voluntary was contrary to or an unreasonable

13 application of clearly established Federal law. "A federal habeas court may not issue the writ simply

14 because that court concludes in its independent judgment that the relevant state-court decision

15 applied clearly established federal law erroneously or incorrectly. Rather, that application must also

16 be unreasonable." Williams, 529 U.S. at 411. To be unreasonable, the State court's application of

17 Federal law must be clearly erroneous. Baker v. City of Blaine 221 F.3d 1108, 1111 (9th Cir. 2000).

18         The United States Supreme Court in Jackson v. Denno, 378 U.S. 368 (1964), held that a

19 defendant's right to be free of conviction or imposition of the death penalty based on a coerced

20 confession requires a State court hearing on the question of voluntariness of the confession, and that

21 the failure to give a defendant such a hearing violates a defendant's due process rights under the

22 Fourteenth Amendment.  Here, before ruling on the admissibility of this evidence, the trial court

23 conducted an evidentiary hearing outside the jury's presence, pursuant to California Evidence Code

24 § 402(b). The trial court concluded that Petitioner's confession was not involuntary, that the

25 interrogator's misrepresentations were not unusual and were part of "normal" interrogation tactics,

26 and that the interrogator's promises of leniency played no part in Petitioner's decision to plead

27 guilty. The 5th DCA agreed with this finding.

28 ///

1    It is established under the Fourteenth Amendment that an involuntary confession in a state

2  criminal case is inadmissible for any purpose, including impeachment.  See Blackburn v. Alabama,

3  361 U.S. 199, 207 (1960); Henry v. Kernan, 197 F.3d 1021, 1028 (9th Cir. 1999).  The voluntariness

4  of a confession is evaluated by reviewing both the police conduct in extracting the statements and the

5  effect of that conduct on the suspect.  See Miller v. Fenton, 474 U.S. 104, 116 (1985); Henry v.

6  Kernan, 197 F.3d at 1026.  Absent police misconduct causally related to the confession, there is no

7  basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment.

8  See Colorado v. Connelly, 479 U.S. 157, 167 (1986); Norman v. Ducharme, 871 F.2d 1483, 1487

9  (9th Cir. 1989).

10    To determine the voluntariness of a confession, the Court must consider the effect that the

11  totality of the circumstances had upon the will of the defendant.  See Schneckloth v. Bustamonte,

12  412 U.S. at 226-227.  The Federal test for determining whether a confession is voluntary is "whether,

13  considering the totality of the circumstances, the government obtained the statement by physical or

14  psychological coercion or by improper inducement so that the petitioner's will was overborne."

15  United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988);  United States v. Fisher, 137

16  F.3d 1158, 1165 (9th Cir. 1998); Derrick v. Peterson, 924 F.2d 813, 817 (9th Cir. 1990).   Relevant

17  circumstances include the conduct of the law enforcement officers, conditions of the interrogation,

18  and the background of the accused.  United States v. Valdez, 16 F.3d 1324, 1329 (2d Cir. 1994).

19  These circumstances are relevant, however, only as they pertain to the critical issue of whether the

20  law enforcement officers obtained the confession by "overbearing" the defendant's will.  Id.; see

21  Lynumn v. State of Illinois, 372 U.S. 528, 534 (1964) (holding "the question in each case is whether

22  the defendant's will was overborne at the time he confessed") (citations omitted).

23    Thus, with respect to interrogations, the test of voluntariness is not a "but-for" test:

24  "[W]e do not ask whether the confession would have been made in the absence of the interrogation.

25  Few criminals feel impelled to confess to the police purely of their own accord, without any

26  questioning at all....Thus, it can almost always be said that the interrogation caused the confession."

27  United States v. Miller, 984 F.2d 1028, 1032 (9th Cir. 1993) (citation omitted).

28  ///

1

3. Misrepresentations By Interrogators.

2

Petitioner contends that his confession was coerced because Martin and Logue made

3

misrepresentations that Kori was already in juvenile hall; that the victim was about to die; that Kori

4

was taking the full blame; and that police could tell from the gunshot residue tests that Petitioner was

5

guilty. (Doc. 1, pp. 6-7). Petitioner also contends that Martin and Logue made implicit promises of

6

leniency based on their statements that he would get better treatment if he confessed, but that if he

7

did not, he would "go down that road himself." (Doc. 1, p. 7).

8

As required by Federal law, the Court will examine the totality of the circumstances,

9

including each of these allegations of coercion, to determine whether the confession violated

10

Petitioner's due process right.

11

The courts have held that even false statements by officers made to induce confessions do not

12

necessarily lead to a finding of coercion. Frazier v. Cupp, 394 U.S. 731, 739 (1969) (interrogators

13

misrepresenting to the defendant that his co-defendant had already confessed held no ground for

14

finding defendant's confession involuntary); Amaya-Ruiz v. Stewart, 121 F.3d 486, 494-496 (9th

15

Cir. 1997)(misrepresentation to defendant that witness had seen him leaving the stolen truck and

16

other statements "which inflate the extent of evidence against a suspect do not necessarily render a

17

confession involuntary"); Norman v. Ducharme, 871 F.2d at 1487-1488 (defendant told that two

18

co-defendants had implicated him, when only one had); Miller v. Fenton, 796 F.2d 598, 607

19

(3d Cir. 1986) (a lie about the time of victim's death not "sufficient trickery" to overcome defendant's

20

will). In addition, Federal courts have consistently held that mere exhortations by law enforcement

21

officers to tell the truth are not sufficient to render defendant's statements involuntary. U.S. v.

22

Chalan, 812 F.2d 1302, 1307 (10th Cir. 1987); United States v. Morgan, 911 F.Supp. 1340, 1350

23

(D. Kan. 1995); see also Sparf v. United States, 156 U.S. 51, 55-56 (1895) (admonition by police to

24

tell the truth does not make the statement involuntary).

25

In this case, nothing said to Petitioner was calculated to put him in immediate fear of his

26

safety or well-being, nor to excite any hope of his escaping punishment by confessing. Petitioner's

27

confession was not involuntary notwithstanding that police told him falsely that Kori was taking the

28

blame, that the victim was about to die,[6] and that gunshot residue tests confirmed that he was guilty.

The questioning was not prolonged, lasting a mere ninety minutes and conducted in reasonable

comfort, and Petitioner was of normal intelligence and had received warnings of his constitutional

rights before he made the incriminating statements.  The statements by Martin and Logue, while not

accurate, were not enough in and of themselves to overcome Petitioner's will.

In sum, the circumstances of which Petitioner complains are not sufficiently grievous to

warrant a conclusion that Petitioner's will was overborne.  See Frazier v. Cupp, 394 U.S. at 739;

Norman v. Ducharme, 871 F.2d at 1487-1488; Amaya-Ruiz v. Stewart, 121 F.3d at 494-496;

Anderson v. Terhune, 2006 WL 3209985 at *5 (9th Cir. Nov. 8, 2006 )(withholding of cigarettes and

warm clothing, exploitation of defendant's mental condition brought on by chronic drug use, threats

of seeking death penalty, ignoring defendant's requests to remain silent held not sufficient to show

confession was coerced).

Indeed, the cases finding coercion have been far more egregious.  See, e.g., Mincey v.

Arizona, 437 U.S. 385, 398-399 (1978)(finding statement obtained from a defendant who was in the

hospital, in near coma condition, and in great pain, while fastened to tubes, needles, and a breathing

apparatus, could not have been voluntary); Haynes v. Washington, 373 U.S. 503, 511-512

(1963)(invalidating confession where suspect was held for over five days and never advised of his

rights); Ashcraft v. Tennessee, 322 U.S. 143, 149-154 (1944)(invalidating confession because police

questioned suspect for thirty-six hours straight); Henry v. Kernan, 197 F.3d at 1028 (confession

involuntary because detectives admittedly continued the interrogation after the suspect clearly

invoked his Miranda rights); California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1046

(9th Cir. 1999)(finding coercive interrogation because the police disregarded suspect's Miranda

rights); United States v. Tingle, 658 F.2d 1332, 1335-1336 (9th Cir. 1981)(finding confession

---

[6]Although the State court did not make an express finding on this purported misrepresentation, the Court does not find that it was a false representation. Dr. Bhatti, the neurosurgeon who operated on the victim, testified that people with the degree of brain injury that the victim's CAT scan indicated "all uniformly die" if they arrive at the hospital in a coma. (LD 4, p. 113). In those cases, Dr. Bhatti would not even operate since that would be pointless. (Id.). However, because the victim here had some "purposeful" movement in one side, Dr. Bhatti decided she was not in a coma and that he would operate. (Id.). Dr. Bhatti also opined that at the time of surgery he estimated that the victim had a 50:50 chance of surviving. (Id.). Given that testimony, Martin's statement to Petitioner that the victim was about to die was not without foundation.

1   involuntary when officer recited litany of maximum penalties for suspect's alleged crimes, expressly

2   stated that suspect would not see her child "for a while," and warned suspect that if she failed to

3   cooperate he would inform prosecutor that she was "stubborn or hard-headed").

4          The totality of the circumstances of Petitioner's interrogation demonstrates that no such

5   improper threats were used to coerce a statement.  The State courts determined that Petitioner's

6   confession was not induced by the false statements or the promises.  Upon review of the record, the

7   Court finds no reason to disturb that determination.

8          4.  Promises of Leniency.

9          Petitioner also claims he was induced to make the challenged statement by an implied

10  promise, or inducement, that things would go better for him if he confessed.  The 5th DCA found

11  that the officers' statements that (1)  "when it comes time for you to be judged by the judge, when it

12  comes time for sentencing do you think he's gonna be more lenient with a guy that tells the truth,"

13  and (2) "if you chose not to help we cannot help you, you're gonna go down that road by yourself.

14  Now when it comes time for Det. Martin to get up on the stand, raise his hand, and tell your side of

15  the story as your said [sic] it versus the truth he will.  If you get up on the stand, or if you tell us the

16  truth when he gets up on the stand he'll tell that and I guarantee you everybody will look at you in a

17  better light," were "impermissible offers of leniency."  (Doc. 6, Exh. 3, p. 21).

18         However, the 5th DCA went on to conclude that the confession was not made coercive by

19  these "impermissible promises" because Petitioner had testified at the pre-trial hearing that Martin

20  and Logue had made no promises to him should he confess.  (Id.).  Thus, "appellant's own testimony

21  rebuts his contention [the promises] were the motivating factor leading to his confession."  (Id.).

22         The State appellate court's determination that the officers' statements to Petitioner constitute

23  "impermissible promises" is a subsidiary factual conclusion in determining whether Petitioner's

24  confession was voluntary that is entitled to a presumption of correctness under the AEDPA.  See

25  Miller v. Fenton, 474 U.S. at 117; Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996)(deferring to

26  state appellate court's conclusion that challenged statement did not constitute a threat or promise).

27  The Court concludes that the State court's legal conclusion that Petitioner's own testimony

28  established that the "impermissible promises" were not the "motivating factor leading to his

confession" and did not therefore render Petitioner's confession involuntary is neither contrary to nor an unreasonable application of clearly established Federal law.

A statement is involuntary if it is "extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (citations omitted). This broadly-stated rule, however, has not been applied to invalidate *per se* all statements made by a suspect in response to promises given by law enforcement personnel; rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all the attendant circumstances. United States v. Leon Guerrero, 847 F.2d at 1366; see Hutto v. Ross, 429 U.S. at 30; Miller v. Fenton, 796 F.2d at 608.

In United States v. Leon Guerrero, the Ninth Circuit concluded that an interrogator's promise to recommend leniency did not render the suspect's confession involuntary. The defendant appeared voluntarily at an FBI office to confer with agents regarding an ongoing illegal kickback investigation. 847 F.2d 1364. The defendant told agents that he wanted to cooperate and that he would sign a waiver of his Miranda rights, but first asked what his cooperation would mean. Id. at 1365. An agent told the defendant that the courts would generally consider whether a criminal defendant had cooperated. Id. The agent also told the defendant that the United States Attorney would make the ultimate charging decision and that the FBI had no control over the prosecutors or the courts and could make no promises. Id.

The defendant then asked to speak to the United States Attorney, who told the defendant that his cooperation would be taken into consideration in any future handling of cases involving him, that whether to cooperate was the defendant's choice, and that he had the right not to cooperate. Id. The defendant reasserted his desire to cooperate, signed a waiver-of-rights form, and thereafter made incriminating statements. Id.

After noting that other circuits had ruled that representations made by a government prosecutor to a suspect during interrogation did not automatically make the suspect's subsequent statements involuntary, e.g., Martin v. Wainwright, 770 F.2d 918, 924-927 (11th Cir. 1985), modified, 781 F.2d 185 (11th Cir. 1986)(five-hour interrogation in which police used "good guy, bad guy" technique, falsely told the suspect that his co-defendant had confessed, and where the United

States Attorney promised suspect psychiatric help and that cooperation would help at sentencing, held not coercive); <u>United States v. Watson</u>, 591 F.2d 1058, 1061 (5th Cir. 1979)(confession to bank robbery held voluntary after FBI agent got state prosecutor agree to consider dropping state charged in exchange for suspect's confession to federal charges held voluntary), the Ninth Circuit concluded that the United States Attorney's "statement that [defendant's] cooperation would be taken into consideration in any future handling of cases involving him was not sufficiently compelling to overbear his free will and rational intellect."  847 F.2d at 1367.

Here, the implicit promises made to Petitioner were far more subtle and modest than those in <u>United States v. Leon Guerrero</u>, 847 F.2d 1363.  Logue and Martin suggested that the judge would be more lenient if Petitioner told the truth, that if he continued to lie the officers could not help Petitioner, and that if he told the truth now, Martin could testify later that he had told the truth during the interrogation, which would cause "everyone" to view Petitioner in a better light.  While all of these promises implicitly suggest that benefits would flow to Petitioner from telling the truth, they fall short of the overt representations in <u>United States v. Leon Guerrero</u> that the officers themselves would recommend leniency, and fall far short of any express representations regarding future treatment in the criminal justice system either by prosecutors or the courts.

Moreover, it bears emphasis that continuing to question a suspect after the suspect claims he is innocent does not constitute coercion and is often necessary to achieve the truth.  <u>Cunningham v. City of Wenatchee</u>, 345 F.3d 802, 810-811 (9th Cir. 2003); <u>see</u> <u>Amaya-Ruiz v. Stewart</u>, 121 F.3d at 494 (stating officers' repeated insistence that suspect tell the truth did not amount to coercion).  Also, officers may recite the sentence a suspect may receive if found guilty, <u>see</u> <u>United States v. Bautista-Avila</u>, 6 F.3d 1360, 1365 (9th Cir. 1993), and may use the suspect's fear of prison as a tactic during the interrogation.  <u>See</u> <u>Cunningham</u>, 345 F.3d at 810; <u>United States v. Sablotny</u>, 21 F.3d 747, 752-753 (7th Cir. 1994).

Finally, as the 5th DCA noted, Petitioner himself testified under oath that the officers made no promises to him if he would talk.  Petitioner's own testimony establishes that, at least in his mind, no promises were made by the officers and thus, even deferring, as this Court must, to the State court's factual finding that "improper" promises were made, such "promises" could not have been

1    the reason Petitioner chose to make incriminating statements to Martin and Logue and could not

2    therefore have led Petitioner to make a false and unreliable confession.  Because, as discussed above,

3    the other circumstances present in the interrogation were also non-coercive, the Court concludes that,

4    notwithstanding the promises made by the officers, Petitioner's confession was voluntary and did not

5    entail a violation of his Federal due process rights.  See United States v. Okafor, 285 F.3d 842, 846-

6    847 (9th Cir. 2002)(customs agent's statements to defendant that he would be subject to 10-20 years

7    in prison and that it would be to his benefit to cooperate with authorities, as well as customs agent's

8    statement that he would let the government know if defendant cooperated, did not render subsequent

9    confession involuntary); United States v. Leon Guerrero, 847 F.2d at 1367.

10           The government has the burden to prove voluntariness of a confession only by a

11   preponderance of the evidence.  E.g., Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v.

12   Pinion, 800 F.2d 976, 980 (9th Cir. 1986).   In light of the discussion above, the State court's

13   determination that the government had met its burden in this case was not unreasonable considering

14   the totality of the circumstances.  Petitioner has failed to show that his will was overborne either by

15   the interrogators' alleged misrepresentations, by their purported promises of leniency, or by the

16   totality of the circumstances.  Thus, the State court's adjudication that Petitioner's confession was

17   not coerced is neither contrary to nor an unreasonable application of clearly established Federal law.[7]

18   Accordingly, Petitioner's claim must be rejected and the Petition for Writ of Habeas Corpus must be

19   denied.

20   ///

21   ///

22   ///

23

24   _____
        [7] In addition to being a violation of Federal due process, Petitioner also contends that his
25   purportedly coerced statement violates the California Constitution. (Doc. 1, p. 6). However, this aspect
     of Petitioner's claim is solely a question of State law, and, generally, issues of State law are not
26   cognizable on Federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991)("We have stated
     many times that 'federal habeas corpus relief does not lie for errors of state law.'"), quoting  Lewis v.
27   Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993)(O'Connor, J.,
     concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may
28   not be corrected on federal habeas").  Accordingly, that portion of Petitioner Ground One that alleges
     a violation of the California Constitution provides no basis upon which to grant habeas relief in the
     instant case.

U.S. District Court

E. D. California                                    19

**ORDER**

Accordingly, for the reasons set forth above, the Petition for Writ of Habeas Corpus (Doc. 1), is HEREBY DENIED with prejudice.

The Clerk of the Court is DIRECTED to enter judgment in favor of Respondent and to close the file.

IT IS SO ORDERED.

Dated:   **November 21, 2006**                                         **/s/ Theresa A. Goldner**
**j6eb3d**                                                          UNITED STATES MAGISTRATE JUDGE